IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

BARRY JENKINS, Individually as     *
Next of Kin, and as     *
Administrator for the Estate of     *
Lawrence Jenkins, Deceased,     *
    *        CV 120-033
    Plaintiff,     *
    *
    v.     *
    *
UNITED STATES OF AMERICA,     *
    *
    Defendant.     *

## O R D E R

Before the Court is Plaintiff's motion for partial summary judgment (Doc. 35), Plaintiff's motion to exclude (Doc. 42), Defendant's motion for partial summary judgment (Doc. 45), and Defendant's motion to exclude (Doc. 47). For the following reasons, Plaintiff's motion to exclude (Doc. 42) is **DENIED WITHOUT PREJUDICE**, Defendant's motion to exclude (Doc. 47) is **DENIED WITHOUT PREJUDICE**, Plaintiff's motion for partial summary judgment (Doc. 35) is **DENIED AS MOOT**, and Defendant's motion for partial summary judgment (Doc. 45) is **GRANTED IN PART and DENIED IN PART**.

## I. BACKGROUND

Plaintiff, Barry Jenkins, brings this Federal Tort Claims Act ("FTCA") case individually and as the Administrator of the Estate

of Lawrence Jenkins ("Decedent").  (Doc. 11, at 1.)  He asserts a claim under the FTCA, a wrongful death claim under Georgia law, and seeks recovery for pre-death pain and suffering, and medical, funeral, and burial expenses.  (Id. at 1-2.)  Plaintiff is the sole surviving parent of Decedent.  (Id. at 1.)  Defendant United States of America, through the Department of Veteran Affairs ("VA"), an agency of Defendant, owned and operated the Charlie Norwood Uptown and Downtown Medical Centers (collectively, the "Augusta VAMC").  (Id. at 2.)  Decedent was an honorably discharged veteran who received medical care from the VA prior to and on the day of his suicide on March 26, 2015.  (Id. at 4.)  He was treated by numerous doctors at the Augusta VAMC "for chronic pain, depression, substance abuse, history of alcohol abuse in sustained remission, and Post Traumatic Stress Disorder" ("PTSD").  (Id.) The specific facts are as follows.

In 2014, Decedent moved from Colorado to Burke County, Georgia to live with Mr. Jenkins.  (Doc. 46, at 2.)  His initial visit with his primary care provider at the Augusta VAMC, Dr. Sridharan, took place March 5, 2014.  (Id.)  Prior to this visit, Decedent was already prescribed and taking opioids for knee pain.  (Id.) Dr. Sridharan continued Decedent on the opioids and referred him for a psychiatric consultation with Dr. Suykerbuyk due to anxiety, PTSD symptoms, and his history of prescriptions for psychotropic medication.  (Id.)  Decedent's first visit with Dr. Suykerbuyk

took place April 15, 2014. (Id.)  Dr. Suykerbuyk performed a
mental health evaluation, obtained full personal and medical
history, and diagnosed Decedent with PTSD, ADHD inattentive type,
tobacco use disorder, and alcohol use disorder in remission. (Id.
at 2-3.)

Decedent continued with treatment and follow up appointments
with both Dr. Sridharan and Dr. Suykerbuyk over the coming months.
(Id. at 6-8.)  They monitored his prescriptions and dealt with
various health issues that arose, including knee pain, his mental
health concerns due to the death of his mother, and others. (Id.)
During his appointments, Decedent frequently requested refills of
his opioid pain medications as well as increases in the dosages.
(Id. at 4-6, 10-11.)  In January 2015, Decedent had an appointment
with Dr. Sridharan for his knee pain, and his father Barry Jenkins
attended with him. (Id. at 11.)  During this visit, Dr. Sridharan
agreed to prescribe more opioids with the understanding that Mr.
Jenkins would administer them to Decedent. (Id.)

In February 2015, Decedent followed up with Dr. Suykerbuyk
for evaluation of his anxiety and insomnia treatment and inquired
about inpatient treatment for PTSD. (Id. at 11-12.)  Dr.
Suykerbuyk also diagnosed Decedent with depression. (Id. at 12.)
Later that month, Decedent met with psychologist David Eberle to
discuss placement in inpatient treatment for his PTSD. (Id.)  Mr.
Jenkins came to this appointment with Decedent and reported that

3

his son was abusing his pain medications. (Id.) Decedent denied thoughts, intents, or plans to attempt suicide or self-harm. (Id.) In late February 2015 and again in late March 2015, Dr. Sridharan had follow up telephone consults with Decedent regarding his pain medication and agreed to switch his prescription to morphine. (Id. at 12-13.)

During a weekend in late March, Decedent left a distressed message on Dr. Suykerbuyk's voicemail, and she then scheduled him to come in for a follow-up. (Id. at 13.) During the March 26, 2015 follow-up, Dr. Suykerbuyk indicated she wanted to taper Decedent off lorazepam because he was abusing his pain medication, and she suggested he needed to reconsider admission in inpatient treatment. (Id. at 13-14.) While he would not agree to inpatient treatment, she did decide to taper Decedent off lorazepam and added a new prescription for anxiety, buspirone (Buspar). (Id. at 14.) Dr. Suykerbuyk did not schedule a follow up with herself; however, she referred Decedent to the general mental health clinic due to his mental health conditions. (Id.; Doc. 51, at 13.) Before the end of the March 26, 2015 visit, Dr. Suykerbuyk performed a suicide risk assessment of Decedent in which he denied a plan or intent to kill himself but reported previous death wishes. (Doc. 46, at 14; Doc. 51, at 13-14 ("I wish it would happen but I'm not going to kill myself").)

Decedent's visit on March 26, 2015 ended before noon, and after picking up his new prescription, he returned home to his father in Burke County around 4:00 P.M. (Doc. 46, at 15.) Upon entering the house, Decedent laid on the floor and cried, and Mr. Jenkins sat on the floor with him. (Id.) Decedent told Mr. Jenkins Dr. Suykerbuyk was going to take away his lorazepam, which he indicated was 'the only thing that's doing me any good.' (Id.) Around 6:00 P.M. Decedent went to his room, but at no point did Mr. Jenkins, a trained registered nurse, have any suspicion he was going to attempt suicide. (Id.) At some point between 6:00 P.M. and 10:00 P.M., Decedent wrote a suicide note and ingested a number of medications, including those prescribed by Dr. Suykerbuyk, and over-the-counter cough medicine not prescribed by anyone at the VA. (Id.) Decedent was pronounced dead just before 11:00 P.M. on March 16, 2015. (Id.) The autopsy ruled the manner of death was suicide due to acute intoxication by the combined effects of Buproprion, Buspirone, and Dextromethorphan (a cough suppressant). (Id. at 15-16.)

## II. MOTIONS TO EXCLUDE

Preliminarily, both Plaintiff and Defendant move to exclude each other's expert and their respective motions for summary judgment are at least partially based on their motions to exclude being granted. The Court addresses the motions below.

## A. Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., [509 U.S. 579, 589 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. Quiet Tech., 326 F.3d at 1340. Specifically, the court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1340-41 (citations omitted).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cnty., No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)). However, an expert's training need not be narrowly tailored to match the exact point of dispute. McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. There are four factors that courts should consider: (1) whether the theory or technique can be tested,

(2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation omitted). For example, experience-based experts need not satisfy the factors set forth in Daubert. See United States v. Valdes, 681 F. App'x 874, 881 (11th Cir. 2017) (affirming admission of testimony from expert identifying firearms based upon years of experience working with firearms). However, "[t]he inquiry is no less exacting where the expert 'witness is relying solely on experience' rather than scientific methodology." Summit at Paces, LLC v. RBC Bank, No. 1:09-cv-03504, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012) (quoting FED. R. EVID. 702, advisory committee's notes to 2000 amendment)). Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). "[W]hether the proposed testimony is scientifically correct is not a consideration for this court, but only whether or not the expert's testimony, based on scientific

principles and methodology, is reliable." In re Chantix Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citations omitted and alterations adopted).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's notes to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." <u>Frazier</u>, 387 F.3d at 1261 (citation omitted) (alterations in original).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." <u>Daubert</u>, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. <u>Id.</u>; <u>Frazier</u>, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Frazier</u>, 387 F.3d at 1262-63. Using these standards, the Court will address the Parties' motions in turn.

## B. Plaintiff's Motion to Exclude Expert Testimony of Dr. Ziv

Plaintiff moves to exclude the testimony of Dr. Barbara Ziv because the methodology has not been tested, subject to peer review and publication, generally accepted, or otherwise established as reliable in the relevant scientific community. (Doc. 42, at 1.) Further, Plaintiff argues Dr. Ziv has not reliably applied accepted scientific principles and methods to the facts. (<u>Id.</u>) In response, Defendant argues Dr. Ziv is qualified to testify as an expert psychiatrist, has provided her methodology based on peer reviewed literature and appropriate American Psychiatric Association ("APA") recommendations, and her opinions are

sufficiently reliable to be heard at trial.  (Doc. 50, at 2-6.) Plaintiff concedes Dr. Ziv is *qualified* to testify as an expert in the area of suicide; however, he argues her opinions are still inadmissible under Daubert and Kumho.  (Doc. 57, at 1-2.)

The crux of Dr. Ziv's opinion is that "the treatment provided to [Decedent] by Dr. Suy[k]erbuyk and all staff at the [Augusta VAMC] met or exceeded standards of care."  (Doc. 17-1, at 31.) She bases this conclusion on her ultimate opinion that "[not] only is it impossible to predict suicide, there is no generally accepted treatment that prevents suicide."  (Id. at 19-20.)  Dr. Ziv is board certified in Psychiatry and Neurology and since 2010 has served as a clinical assistant professor at Temple University School of Medicine teaching residents.  (Id. at 2.)  Since 1995, she has also engaged in private practice, including treating patients with psychiatric issues.  (Id.)

Since the Parties agree Dr. Ziv is qualified to testify as an expert, the Court will start at the second step of the analysis – reliability.  Plaintiff argues Dr. Ziv's opinions are not reliable, lack a proper foundation, and are not supported by her cited authorities.  (Doc. 42-1, at 2.)  Plaintiff asserts "Dr. Ziv's opinions are not based on any evidence-based research she has performed or in which she has participated."  (Id.)  Further, he argues her "final conclusion is not supported by science, the facts of this case[,] and there is no methodology which leads to it;"

instead, the opinion contains "large unconnected leaps, is inaccurate[,] and misleading." (Id. at 3.)

First, the Court addresses the cited articles, which Plaintiff argues do not support Dr. Ziv's conclusion. (Id.) In rebuttal, Defendant asserts Plaintiff did not even review the articles, but only read the abstracts.[1] (Doc. 50, at 7.) It also argues "the peer reviewed research indicates that '[i]ndividual risk factors have a limited ability to predict suicide in an individual at a particular time.'" (Id. at 8.) Defendant believes Plaintiff's arguments are "appropriate for cross-examination to clarify Dr. Ziv's expert opinions, but they are not a basis for wholly striking her expert report." (Id. at 7.)

Plaintiff asserts "[n]ot a single article cited in Dr. Ziv's expert report stands for the conclusions she advances"; however, upon review of the cited articles, the Court finds Dr. Ziv's conclusions are supported by the articles. (See Doc. 42-1, at 3.) For example, the APA Practice Guidelines for the Psychiatric Evaluation of Adults contains a list of recommended steps for psychiatric evaluation, which Dr. Ziv includes in her expert report; however, at the end of the list the APA provides, "[t]he goal of this guidelines is to improve, during an initial

---

[1] The Court notes that Plaintiff in fact did attach abstracts of many articles to his motion to exclude (Doc. 39-1), and his references to the articles were extremely difficult to follow. Therefore, the Court reviewed many articles; however, was unable to link every single reference Plaintiff made to the appropriate citation.

psychiatric evaluation, the identification of patients who are at increased risk for suicide. *The strength of research evidence supporting these recommendations is low.*" (Doc 38-6, at 24 (emphasis added).) Further, the United States Preventative Services Task Force ("USPSTF") 2014 report supports Dr. Ziv's findings. (<u>See</u> Doc. 38-3; Doc. 42-1, at 5-7.) Plaintiff argues this report's "Suggestions for Practice Regarding the I Statement" is generally consistent with Dr. Strahl's opinion and the standard of care in suicidology. (Doc. 42-1, at 5.) However, Plaintiff ignores the report's conclusion that "[t]here is insufficient evidence to conclude that screening adolescents, adults, and older adults in primary care adequately identifies patients at risk for suicide who would not otherwise be identified on the basis of an existing mental health disorder, emotional distress, or previous suicide attempt." (Doc. 38-3, at 1.) The Court finds this report supports Dr. Ziv's conclusions that "[i]ndividual risk factors have a limited ability to predict suicide in an individual at a particular time." (Doc. 50, at 8.) Based on these findings, the Court finds Dr. Ziv's conclusions and opinions are backed by cited articles.

Next, Plaintiff characterizes Dr. Ziv's conclusion to mean "suicide risk assessment is useless and prevention is futile." (Doc. 42-1, at 4.) Plaintiff also takes issue with the fact "Dr. Ziv does not identify a standard of care, but rather seeks to

express unsupported opinions that there is no standard of care due to lack of foreseeability and preventability." (Id. at 12.) Dr. Ziv specifies she is not advocating one should ignore risk factors or consider suicidal patients untreatable; instead, she is of the opinion that "correlation is not causation." (Doc. 50, at 8.) Further, her expert report provides the applicable APA standard of care, including how to assess and evaluate patients, she showed how the VA met this standard, and showed how Decedent did not meet the criteria for hospitalization. (Doc. 50, at 7 (citing Doc. 17-1, at 25-31).) Defendant argues Dr. Ziv's report provides:

> the applicable standard of care as set forth by the [APA], including the manner in which psychiatric patients should be assessed and evaluated, the manner in which the VA psychiatrist met this standard, the recommendations from the APA on when admission for patients at risk for suicide is indicated[,] and the reasons why the [Decedent] did not meet criteria for hospitalization.

(Id. (citations omitted).) Her expert report contains excerpts from the APA recommendations outlining factors used to assess suicidal patients and the APA guidelines for hospital admission due to suicidal behavior. (Doc. 17-1, at 26-30.) Dr. Ziv relies on the APA recommendations to reach her ultimate opinion that the Augusta VAMC staff acted within standards of medical and psychiatric care, appropriately assessed and treated Decedent, documented the "vast majority" of the recommended factors, and decided Decedent did not meet APA guidelines for psychiatric

hospitalization.  (Id.)  The Court finds no reason to conclude her opinion is "untested and unsupportable" as she has provided support and a basis for her conclusions.  (See Doc. 56, at 5.)  The Court will allow Plaintiff to raise additional objections as to the admissibility of Dr. Ziv's opinions at trial; however, at this point there is no reason to exclude her expert testimony.  Based on the foregoing, Plaintiff's motion to exclude (Doc. 42) is **DENIED WITHOUT PREJUDICE**.

**C. Defendant's Motion to Exclude Expert Testimony of Dr. Strahl**

Defendant moves to exclude certain expert opinions from Dr. Nathan Strahl, Plaintiff's expert psychiatrist.  (Doc. 47, at 1.) It argues his

> opinions as to standards of care in primary care, internal medicine, pain management, and any other opinions outside the realm of psychiatry and mental health should be excluded because Dr. Strahl is not qualified to testify as an expert in the areas of primary care, internal medicine, pain management, or any specialty other than psychiatry and mental health.

(Id.)  In response, Plaintiff argues "[s]o long as the expert is of the same profession as the negligent actor, Georgia law does not require the expert to have the same sub-specialty of medicine as the negligent actor."  (Doc. 54, at 1 (citing Hankla v. Postell, 749 S.E.2d 726, 730 (Ga. 2013).)  Plaintiff argues "Dr. Strahl is a MD, as is Dr. Sridharan," and Dr. Strahl routinely treats this type of patient and collaborates with other physicians just as Dr. Sridharan does at the VA. (Id. at 2, 4.)  He believes "[i]t is

immaterial and irrelevant if Dr. Strahl does not identify himself as an 'expert' in areas other than mental health" because he is still qualified to opine in all the areas in which he offered opinions. (Id. at 4.) Defendant insists Hankla does not support Plaintiff's assertions. (Doc. 62, at 2.)

> To qualify as an expert in a medical malpractice action in Georgia, the witness must (1) have actual knowledge and experience in the relevant area through either active practice or teaching and (2) either be in the same profession as the defendant whose conduct is at issue or qualify for the exception to the same profession requirement.

Dutton v. United States, 621 F. App'x 962, 967 (11th Cir. 2015) (quoting Hankla, 749 S.E.2d at 729). However, as Plaintiff correctly points out, "a physician, or psychiatrist, need not be a specialist in a particular field in order to qualify as an expert." (Doc. 54, at 3 (quoting Floyd ex rel. Ray v. United States, No. 3:08-CV-122, 2010 WL 4905010, at *10 (M.D. Ga. Nov. 26, 2010).)); see also McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004) ("The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline."). Dr. Strahl is closely aligned to the doctor in Floyd in that "he is not a suicidologist, psychopharmacologist, epidemiologist, statistician, or an expert on FDA regulations" however, he is board certified by the American Board of Psychiatry and has been a practicing psychiatrist for the last ten years. See Floyd, 2010 WL 4905010, at *10; (Doc. 47-1,

at 2-3.)   As in _Floyd_, Dr. Strahl's "lack of particularized expertise goes to the _weight_ accorded his testimony, not the _admissibility_ of his opinion as an expert." 2010 WL 4905010, at *10 (citing _United States v. Garcia_, 7 F.3d 885, 890 (9th Cir. 1993)).

During his deposition, Dr. Strahl admits he is not qualified to offer expert opinions specifically in the areas of primary care, internal medicine, and other areas; however, for the last 6-7 years, Dr. Strahl "worked as a [p]sychiatrist in a team of professionals to care for complex and mental health patients including veterans within the prison population where [he is] employed." (Doc. 45-8, at 7; Doc. 52-1, at 1.)  Based on this, the Court finds his experience is enough to at least suggest he is familiar with the treatment of someone like Decedent.  Therefore, the Court will allow Defendant to raise additional objections as to admissibility at trial; however, finds at this point there is no reason to exclude his expert testimony simply because his "area of expertise" is not directly focused on the same areas as the doctors at issue.  Based on the foregoing, Defendant's motion to exclude (Doc. 47) is **DENIED WITHOUT PREJUDICE.**

### III. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff's motion for partial summary judgment (Doc. 35) is "predicated on the Court granting Plaintiff['s] Motion to Exclude

Dr. Ziv because her opinions are not generally accepted within the scientific community requiring exclusion under Daubert." (Doc. 35-1, at 1.) However, as the Court explained above, at this time the Court will not exclude Dr. Ziv's opinions because she provides a basis for reliability and articles supporting her opinions. See Supra Part II.B. Based on this, Plaintiff's motion for partial summary judgment is **DENIED AS MOOT**.

### IV. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant moves for partial summary judgment, arguing "Plaintiff has failed to carry [his] burden of introducing admissible expert testimony on each element of certain allegations of medical malpractice." (Doc. 45, at 1.) First, Defendant argues Plaintiff did not present admissible expert testimony for elements of medical malpractice outside the realm of psychology and mental health. (Id. at 18.) Second, Defendant argues Plaintiff has not submitted any expert testimony for the "alleged pattern of negligent medical care and systematic failures." (Id. at 19.) Third, Defendant moves for summary judgment as to the allegation Dr. Suykerbuyk was negligent in prescribing a potentially lethal dose of medication on March 26, 2015. (Id. at 21.)

In response, Plaintiff argues he has sufficient evidence to demonstrate systematic and institutional failures by the VA that are negligent. (Doc. 53, at 3.) He points to numerous of Dr.

Strahl's opinions related to systematic failures in this matter. (Id. at 3-7.)  Finally, Plaintiff argues Defendant is not entitled to summary judgment on all other claims of negligence beyond March 26, 2015, because despite Defendant's contention this is not a common medication with which to commit suicide, the VA can still be liable for sending enormous amounts of medication home with Decedent.  (Id. at 8.)

Defendant again argues Dr. Strahl amended many of his opinions during his deposition and "was unable or unwilling to testify under oath that, to a reasonable degree of medical certainty, a breach of the standard of care occurred other than on March 26, 2015." (Doc. 63, at 5.)  However, Plaintiff stands by his contention that Dr. Strahl's opinions include negligence prior to March 26, 2015 and it was foreseeable Decedent could overdose based on his prescribed medications.  (Doc. 68, at 2-4.)  The Court addresses the Parties' arguments below.

## V. SUMMARY JUDGMENT STANDARD

·Under Federal Rule of Civil Procedure 56, motions for summary judgment are granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "An issue of fact is 'material' if . . . it might affect the outcome of the case . . . [and it] is 'genuine' if the record taken as a whole

could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992)).   The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor."   United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).   The Court should not weigh the evidence or determine credibility.   Anderson, 477 U.S. at 255.

Defendant here does not bear the burden of proof at trial, and therefore may "satisfy its initial burden on summary judgment in either of two ways." McQueen v. Wells Fargo Home Mortg., 955 F. Supp. 2d 1256, 1262 (N.D. Ala. 2013) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)).   First, Defendant "may simply show that there is an absence of evidence to support [Plaintiff's] case on the particular issue at hand." Id. (citation omitted).   If this occurs, Plaintiff "must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id.

(citation omitted).  Or second, Defendant may "provide affirmative *evidence* demonstrating that [Plaintiff] will be unable to prove [his] case at trial.  Id.  (citation omitted and alterations in original).

The Local Rules require the movant include a statement of undisputed material facts with its motion.  See L.R. 56.1, SDGa. "Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007).  Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment."  Id. (citing Resol. Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)).  Accordingly, the Court will only review materials the Parties specifically cited and legal arguments they expressly advanced.  See id.

In this action, the Clerk of Court provided Plaintiff notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 48.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  Plaintiff responded to the motion (Doc. 53), Defendant replied (Doc. 63), and Plaintiff again responded in opposition (Doc. 68).  The time for filing materials has expired,

the issues have been thoroughly briefed, and the motions are now ripe for consideration.   In reaching its conclusions herein, the Court evaluated the Parties' briefs, other submissions, and the evidentiary record in the case.

## VI. DISCUSSION

The FTCA provides that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  Liability under the FTCA is determined "in accordance with the law of the place where the act or omission occurred," which in this instance is Georgia.  See 28 U.S.C. § 1346(b)(1).  Georgia requires three essential elements to establish liability in a medical malpractice action: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained."  Zwiren v. Thompson, 578 S.E.2d 862, 864 (Ga. 2003) (citations omitted). Georgia law also provides: "the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim."  O.C.G.A. § 9-11-9.1(a).

Defendant moves for partial summary judgment on various claims. As to its first basis, the Court already denied without prejudice Defendant's motion to exclude Dr. Strahl's opinions on other medical specialties based on his experience dealing with suicide patients; therefore, this basis for summary judgment fails. Second, it moves for summary judgment on the pattern of negligent medical care and systematic failures. (Doc. 45, at 19-21.) While there are certainly inconsistencies between Dr. Strahl's expert report and his deposition, the Court cannot ignore the additional declaration Plaintiff filed to clarify some of Dr. Strahl's positions. (Doc. 52-1.) In this declaration, Dr. Strahl states Defendant has "mischaracterized" his deposition testimony regarding the VA's treatment of Decedent prior to March 26, 2015, as he identified "institutional and systematic failures" prior to this date that demonstrate the VA deviated from the standard of care at various points. (Id. at 2-4.) Dr. Strahl includes several examples of failures including "failure to coordinate with primary care [doctors] and address chronic pain issues," "VA's failure to integrate care from a controller or coordinator lacking overall care review," and many others. (Id. at 2.) The basis of Plaintiff's allegation of institutional and systematic failures is Dr. Strahl's opinion that for Decedent's co-morbidities, there was not "adequate and proper communication and coordination among providers and specialists to ensure that proper treatment is

provided to the patient." (Id. at 1.)  While concerned with the inconsistencies of the expert testimony, the Court finds there is a genuine dispute of material fact as to whether there was a pattern of negligent medical care and systematic failures. Therefore, Defendant's motion is denied on this basis.

Third, Defendant moves for summary judgment regarding Dr. Suykerbuyk prescribing a potentially lethal dose of medication on March 26, 2015. (Doc. 45, at 21-22.)  Plaintiff argues Defendant has not offered an expert opinion to support its position.  (Doc. 53, at 8.)  In turn, Defendant argues Plaintiff failed to support his own allegation with expert testimony that Dr. Suykerbuyk could have foreseen Decedent would use the prescriptions to commit suicide.  (Doc. 63, at 7.)  Defendant relies on Dr. Strahl's deposition testimony in which when asked, "[a]s a psychiatrist treating . . . a patient in [Decedent's] position, with the symptoms that he had, would a psychiatrist prescribing bupropion and BuSpar be alert to the fact that the patient could use these medications to commit overdose?" which he responded "no" and "[i]t would be out of the blue." (Id.; Doc. 45-8, at 17.)  Plaintiff argues that even if BuSpar and bupropion are not common medications with which to commit suicide, the VA is not insulated from liability "for sending enormous amounts of prescriptive medication home . . . with a patient imminently at risk for suicide when he was known to be actively abusing opiates." (Doc. 53, at 8.)

"[A] plaintiff cannot recover for medical malpractice, even [assuming] there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence 'either proximately caused or contributed to cause plaintiff harm.'" Zwiren, 578 S.E.2d at 864 (citations omitted). "What amounts to proximate cause is undeniably a jury question." Id. at 865 (citations omitted). At the motion for summary judgment stage there still must be evidence of proximate causation; however,

> [i]t is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

Pruette v. Phoebe Putney Mem'l Hosp., 671 S.E.2d 844, 850 (Ga. Ct. App. 2008) (quoting Powell v. Harsco Corp., 433 S.E.2d 608 (Ga. Ct. App. 1993)). The evidence, including Dr. Strahl's own testimony, is that it was not foreseeable Decedent would use Dr. Suykerbuyk's prescription on March 26, 2015 to commit suicide. (See Doc. 45-8, at 17.) Plaintiff provides no further expert testimony of causation or foreseeability even though it was his responsibility to do so at this stage in the case. Therefore, no reasonable juror could find, based on the evidence Plaintiff provides, that Dr. Suykerbuyk's actions in prescribing bupropion and BuSpar on March 26, 2015 foreseeably caused Decedent's suicide. Based on this, there is an absence of evidence to support

Plaintiff's case on this allegation and Defendant is entitled to summary judgment on this claim.

### VII. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's motion to exclude (Doc. 42) is **DENIED WITHOUT PREJUDICE,** Defendant's motion to exclude (Doc. 47) is **DENIED WITHOUT PREJUDICE,** Plaintiff's motion for partial summary judgment (Doc. 35) is **DENIED AS MOOT,** and Defendant's motion for partial summary judgment (Doc. 45) is **GRANTED IN PART and DENIED IN PART.**

**ORDER ENTERED** at Augusta, Georgia, this _14th_ day of September, 2022.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA